## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 13 2017, 6:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Shannon Mears
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of: J.F., Minor Child, and J.F., Father | December 13, 2017 |
| | Court of Appeals Case No. 49A02-1707-JT-1633 |
| *Appellant-Respondent*, | Appeal from the Marion Superior Court |
| v. | The Honorable Marilyn A. Moores, Judge |
| The Indiana Department of Child Services, | The Honorable Larry Bradley, Magistrate |
| *Appellee-Petitioner*. | Trial Court Cause No. 49D09-1611-JT-1166 |

**Brown, Judge.**

[1] Jo.F. ("Father") appeals the involuntary termination of his parental rights with respect to J.F. Father raises three issues which we consolidate and restate as whether the trial court erred in terminating his parental rights. We affirm.

*Facts and Procedural History*

[2] J.F. was born on March 18, 2014. On March 25, 2014, Father was charged with unlawful possession of a firearm by a serious violent felon as a class B felony under cause number 49G21-1403-FB-15454 ("Cause No. 454") for knowingly or intentionally possessing a handgun on or about February 20, 2014.[1] In October 2015, the Indiana Department of Child Services ("DCS") removed J.F. from the care of his mother. In November 2015, DCS alleged that J.F. was a child in need of services ("CHINS"). Following a factfinding hearing in February 2016 at which Father failed to appear and Mother admitted J.F. was a CHINS, the court found in part that Father was incarcerated and unavailable to parent his child and adjudicated J.F. to be a CHINS. The court's February 2016 dispositional order provided that the permanency plan for J.F. at the time was reunification with her parents and ordered Father to contact DCS within seventy-two hours of his release from incarceration. In June 2016, Father entered a plea agreement in Cause No. 454, and the trial court entered a judgment of conviction and sentenced him to ten years with four years executed

---

[1] Father had been previously convicted of burglary as a class B felony in 2009. Family case manager Alicia Parker testified that to her knowledge Father was incarcerated in March 2014.

at the Department of Correction ("DOC").[2]  The court entered a permanency hearing order on November 4, 2016, which stated that J.F.'s mother had signed an adoption consent, that Father was incarcerated and at the prior hearing had indicated he wanted to sign a consent, that J.F. was doing well in the care of her maternal grandmother, and that the guardian ad litem was in agreement with the plan changing to adoption.

[3]     On November 22, 2016, DCS filed a petition for involuntary termination of the parent-child relationship of Father and J.F.  An entry dated March 9, 2017, in the chronological case summary ("CCS") in Cause No. 454 indicates the court entered an "Order to Release From Custody To Be Held For Other Agency" and indicates "Community Correction Staff."  Petitioner's Exhibit 7 at 13.  Another entry on March 9, 2017, stated in part "Continue on Community Corrections Work Release with Strict Compliance."  *Id.*  Father did not contact DCS upon his release from incarceration.  The CCS in Cause No. 454 includes an entry on March 31, 2017, stating that community corrections filed a violation against Father; entries on April 3, 2017, stating that an arrest warrant was issued and served; and an entry on April 17, 2017, stating "Amended Disposition on Violation/Noncompliance," "Confinement to Commence

---

[2] The trial court's June 2016 Order of Judgment of Conviction and Sentence under Cause No. 454 states that Father received a total sentence of ten years, a total executed sentence of six years, four years of which was ordered executed at the DOC and two years of which was ordered to be served as a community corrections placement, and a suspended sentence of four years.  An abstract of judgment and the chronological case summary in that cause state that Father received a total sentence of ten years, an executed sentence of eight years, four years of which was ordered to be served in the DOC and four years of which would be served as a community corrections placement, and a suspended sentence of two years.

04/13/2017 Indiana Department of Correction," "Term: 10 Yr," "Jail Credit: 1107," and "Suspended: 2 Yr." *Id.* at 15.

[4] On June 21, 2017, the trial court held a termination hearing at which Father was not present and the court heard testimony from J.F.'s maternal grandmother, family case manager Alicia Parker ("FCM Parker"), and guardian ad litem Tanya Dixson-Jones ("GAL Dixson-Jones"). FCM Parker testified that J.F. was three years old, that the court entered a dispositional order in February 2016 after J.F. was adjudicated a CHINS, that no services were ordered for Father at the time because he was incarcerated, that to her knowledge Father was initially incarcerated in March 2014, and that there was a brief time in which he was released to work release. FCM Parker indicated that Father had made no efforts to participate in the case and that there was no documentation that he made contact with DCS. She testified that J.F. was born in March 2014, was removed from her mother's care in October 2015, has never returned to the care of either of her parents, was currently placed with her maternal grandparents, and that, in addition to her grandparents, J.F. has a younger brother and an uncle who reside in that home. She testified that J.F. appears very bonded to her care givers and her younger brother. She also testified that J.F. does not know Father, that the pre-adoption home is that of the maternal grandparents, that J.F.'s mother had signed an adoption consent, and that DCS believed that adoption was a satisfactory permanency plan and was in the best interest o f J.F. She further testified that J.F. had idled in the DCS system and was three years old and that she believed J.F. deserved the

right to have permanency and to close a chapter in her life and be permitted to grow and thrive and have a life that is not interrupted by service providers.

[5] J.F.'s maternal grandmother testified that J.F. had never been placed with anyone else and that she is basically the only home that J.F. has ever known. She testified that J.F. is doing well and that, with J.F.'s sickle cell, she takes her to the doctor every month to make sure her blood counts are proper. She testified that she had stayed up with J.F. when she became sick and her leg hurt, that she wrapped J.F.'s leg with a heating pad as the doctor instructed and gave J.F. her medication, and that one time she took her to the emergency room when she had a fever. She indicated she felt she had been able to provide J.F. with the appropriate care and treatment she needs. When asked how many times J.F. has seen Father during her life, she responded that Father had seen J.F. three times. She testified that when he was on work release he went to the school, that she told Father he needed a court order to go to the school, and that Father indicated it would not happen again. She stated that Father came to her house and she let him in the living room, that J.F. did not know Father and he was not there very long, and that she later received a call from a teacher that Father had gone back to the school. She also testified that she "was allowing him to call on the phone, just trying to be a decent person, and um I let her talk to him on the phone," that she was there to observe it, and that J.F. "is just talking to a stranger." Transcript Volume II at 22. J.F.'s grandmother indicated that she and her husband wished to adopt J.F.

[6]     GAL Dixson-Jones testified that she believed J.F.'s placement with her maternal grandmother was appropriate and in J.F.'s best interest because J.F.'s needs were being met, she is bonded to that family, she has been there for an extensive amount of time, and that they love her, parent her, and raise her as if she was their own. GAL Dixson-Jones also testified that she agreed the plan should remain adoption for the same reasons. She also testified that to her knowledge there is not any bond between J.F. and Father and that she agreed it was in the best interest of J.F. for the parent-child relationship between J.F. and Father to be terminated.

[7]     The trial court entered an order terminating the parent-child relationship of Father and J.F. Specifically, the order states in part:

> 8.     [Father] was incarcerated before [J.F.] was born and subsequently convicted of Unlawful Possession of a Firearm by a Serious Violent Felon.
>
> 9.     During the CHINS case, [Father] was placed on work release but was sent back to prison within a month due to violating probation.
>
> 10.    Pursuant to the Dispositional Decree, [Father] was to contact the IDCS within seventy-two hours of his release. He did not do so.
>
> 11.    While on release, [Father] made three contacts with his daughter but was told he needed to contact the family case manager for a court order, much like the father of [J.F.'s] half-sibling.
>
> 12.    [Father] has brief phone contact with [J.F.].

13. [J.F.] has resided with her maternal grandparents all her life. She remains there as a preadoptive placement.

14. [J.F.] has Sickle Cell Anemia for which she needs medical care, with attentive caregivers in a structured environment.

15. [J.F.] has been observed as being very bonded with her caregivers and half-sibling who resides in the same household.

16. [J.F.'s] maternal grandmother describes [J.F.'s] relationship with her father as being a stranger.

17. [Father] has a history of violence against women.

18. There is a reasonable probability that the conditions that resulted in [J.F.'s] removal and continued placement outside the home will not be remedied by her father who remains incarcerated. When not incarcerated he did not take steps to contact the IDCS and request visits or services.

19. There is a reasonable probability that the confirmation of the parent-child relationship poses a threat to [J.F.'s] well-being in that it would pose as a barrier to obtaining permanency for her through an adoption into the only home she has known and is medically safe, and not be disrupted when she has no bond with her father.

20. Termination of the parent-child relationship is in the best interests of [J.F.]. Termination would allow her to be adopted into a stable and permanent home where her needs will be safely met.

21. There exists a satisfactory plan for the future care and treatment of [J.F.], that being adoption.

22. Based on [J.F.'s] placement, with her half-sibling, where she has a bond and is having her needs met, and her need for permanency, the Guardian ad Litem believes it to be in

[J.F.'s] best interests that [Father's] parental rights be terminated and she be adopted.

Appellant's Appendix Volume II at 12-13.

## *Discussion*

[8] The issue is whether the trial court erred in terminating Father's rights. Father argues that the evidence does not show that the conditions resulting in J.F.'s placement outside the home would not be remedied, that the continuation of the parent-child relationship poses a threat to J.F.'s well-being, or that termination of the parent-child relationship is in the best interests of J.F. DCS maintains that Father does not challenge any of the trial court's findings of fact and the unchallenged findings support the court's order.

[9] In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

(B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[10] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id.* We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.*

[11] This review is not a license to reweigh the evidence. *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which require *the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind.

1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

## 1. *Remedy of Conditions*

[12] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of J.F. outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[13] In determining whether the conditions that resulted in J.F.'s removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration

evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.*

[14] "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[15] To the extent Father does not challenge the court's findings of fact, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*. DCS is not required to offer a parent services aimed at reunification with the child

when the parent is incarcerated. *See Castro v. State Office of Family & Children*, 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), *trans. denied*. A parent's habitual patterns of conduct must be evaluated to determine the probability of future negative behaviors. *In re K.T.K.*, 989 N.E.2d at 1234. Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children. *Id.* at 1235-1236. A parent's incarceration is an insufficient basis for termination, and we have "not established a bright-line rule for when release [from incarceration] must occur to maintain parental rights." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 643, 648 (Ind. 2015). Also, we have noted that the provision of services is not an element of the termination statute. *In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000); *see In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009) (noting that "a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law").

[16] The record reveals that Father was convicted of burglary as a felony in 2009, that he was arrested for possession of a handgun on or about February 20, 2014, and that J.F. was born on March 18, 2014. On or about March 9, 2017, Father was placed on work release with strict compliance through community corrections. Although the court's February 2016 dispositional order required Father to contact DCS within seventy-two hours of his release from incarceration, FCM Parker testified that Father did not make any efforts to participate in the case and that there was no documentation that he made contact with DCS. Further, a violation was filed on March 31, 2017, and an

arrest warrant was issued and served on April 3, 2017. Father's placement with community corrections was revoked for noncompliance, and he was ordered confined to the DOC to complete the executed portion of his sentence. Father does not point to evidence that, during the period when he was not incarcerated, he contacted DCS to request services or otherwise express an interest in seeing or reunifying with J.F.

[17] Given Father's incarceration, uncertain future, lack of a relationship with J.F., and criminal history, we cannot say that the conclusion reached by the trial court that there is a reasonable probability that the conditions leading to J.F.'s removal and continued placement outside the home will not be remedied is clearly erroneous.

2.    *Best Interests*

[18] In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification, and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently

impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. Recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[19] The trial court found J.F. had resided with her maternal grandparents for all her life and remained there as a pre-adoptive placement, that J.F. has sickle cell anemia for which she needs medical care with attentive caregivers in a structured environment, that J.F. has been observed as being very bonded with her caregivers and half-sibling who reside in the same household, and that J.F.'s maternal grandmother described J.F.'s relationship with Father as being a stranger. The evidence presented at the termination hearing supports the court's findings. Moreover, both GAL Dixson-Jones and FCM Parker testified that it was in the best interest of J.F. that the parent-child relationship of J.F. and Father be terminated and that adoption was a satisfactory permanency plan and was in the best interest of J.F. Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the determination that termination is in the best interests of J.F. is supported by clear and convincing evidence.

### *Conclusion*

[20] We conclude that the trial court's judgment terminating the parental rights of Father is supported by clear and convincing evidence. We find no error and affirm.

[21] Affirmed.

Baker, J., and Riley, J., concur.